Joseph Osler BRICE and Laurajean Councill Brice, On behalf of their son, Joseph Tilghman Brice, Petitioners–Appellants,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent–Appellee.

No. 99–5144.

United States Court of Appeals, Federal Circuit.

Feb. 23, 2001.

Peter Harwood Meyers, George Washington University Law School, of Washington, DC, argued for petitioners-appellants.

Mark W. Rogers, Attorney, Torts Branch, Civil Division, Department of Justice of Washington, DC, argued for respondent-appellee. With him on the brief were Helene M. Goldberg, Director; and John Lodge Euler, Deputy Director.

Before PAULINE NEWMAN, CLEVENGER, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting Opinion filed by Circuit Judge NEWMAN.

DECISION

DYK, Circuit Judge.

In *Weddel v. Secretary of Health and Human Services*, 100 F.3d 929 (Fed.Cir. 1996), this court held that equitable tolling of the limitations period was not available for claims arising under section 16(a)(1) of the National Childhood Vaccine Injury Act of 1986 ("Act"), 42 U.S.C. §§ 300aa–1 *et seq.*, which applies to vaccines administered prior to the effective date of the Act ("pre-Act cases"). This case presents the

question whether equitable tolling is available for claims arising under section 16(a)(2) of the Act, which applies to vaccines administered after the effective date of the Act ("post-Act cases"). We hold that equitable tolling is not available in such cases.

## I

Congress established the National Vaccine Program in 1986 "to achieve optimal prevention of human infectious diseases through immunization and to achieve optimal prevention against adverse reactions to vaccines." 42 U.S.C. § 300aa–1. As part of this program, Congress established the National Vaccine Injury Compensation Program ("Program") to provide compensation for vaccine-related injuries and deaths. *See* 42 U.S.C. § 300aa–10.

The Act creates a federal no-fault system for compensating injuries causally connected to vaccines. The Act establishes a claims procedure involving the United States Court of Federal Claims and special masters, *see* 42 U.S.C. § 300aa–12, and it provides two separate mechanisms through which a party seeking compensation may establish that an injury was caused by a vaccine. First, a causal connection between vaccine and injury is rebuttably presumed if the administration of the vaccine and the particular injury are related in time as specified in the Vaccine Injury Table of 42 U.S.C. § 300aa–14. *See* 42 U.S.C. §§ 300aa–11(c)(1)(C)(i), 300aa–13(a)(1). If the injury is not listed in the Table, or if its symptoms are not evident within the time frame specified by the Table, an injured claimant faces a more demanding evidentiary burden. Such a claimant must prove that the vaccine was the actual cause of the injury. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii). As this court has noted, "[g]iven the vagaries of human illnesses, particularly in young children, that is not always an easy burden to carry." *Munn v. Sec. of Dep't of Health and Human Servs.*, 970 F.2d 863, 865 (Fed.Cir.1992).

The Act does not entirely preclude traditional tort remedies. However, before an individual may bring an action seeking more than $1,000 in damages in state or federal court, he must first file a petition under the Program. *See* 42 U.S.C. § 300aa–11(a)(2)(A). The filing of a petition under the Program stays the running of state statutes of limitations. *See* 42 U.S.C. § 300aa–16(c). The Act then gives a petitioner the choice to accept the judgment obtained under the Program and surrender his tort rights or to reject that judgment and pursue a civil action for damages. *See* 42 U.S.C. § 300aa–21(a). We need not decide in this case whether a petitioner who fails to file a timely petition under the Program may still pursue traditional tort remedies.

In establishing the Vaccine Program, two concerns motivated Congress. First, it was concerned that tort liability would make production of vaccines economically unattractive, potentially discouraging vaccine manufacturers from remaining in the market. *See* H.R.Rep. No. 99–908, at 6–7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6347–48. Congress thus included in the Act certain federal modifications of state tort law, including limits on punitive damage awards and a rule that a vaccine manufacturer shall not be held liable in post-Act cases if an injury resulted from unavoidable side effects provided the vaccine was properly prepared and accompanied by proper directions and warnings. *See* 42 U.S.C. §§ 300aa–22(b)(1), 300aa–23(d). Second, Congress was concerned that the traditional tort system was inadequate to compensate many who were injured by vaccines. Congress noted that the opportunities of those injured by vaccines to seek redress under the traditional tort system were "limited, time-consuming, [and] expensive," and that for the injured, "mounting expenses must be met." H.R.Rep. No. 99–908, at 6, *reprinted in* 1986 U.S.C.C.A.N. at 6347. Congress intended awards under the Act to be made "quickly, easily, and with certainty and

generosity." H.R.Rep. No. 99–908, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6344. Congress also emphasized the importance of speed and the quick resolution of petitions: "The entire proceeding—from date of filing through Special Master proceedings and court review—is to take place as expeditiously as possible .... [M]uch of the equity in limiting compensation and limiting other remedies arises from the speed and reliability with which the petitioner can expect judgment; without such quick and certain conclusion of proceedings, the compensation system would work an injustice upon the petitioner." H.R.Rep. No. 99–908, at 17, *reprinted in* 1986 U.S.C.C.A.N. at 6358.

## II

■ Joseph Tilghman Brice ("Tilghman") and his parents, Dr. Laurajean Councill Brice and Dr. Joseph Osler Brice, seek compensation under the Act for injuries that Tilghman allegedly suffered from a Measles, Mumps, and Rubella ("MMR") vaccination he received on April 30, 1992. Nine days later, on May 9, 1992, Tilghman suffered a seizure, which petitioners contend constituted the first manifestation of a vaccine-related injury. Section 16(a)(2) of the Act specifies that for a post-Act vaccine such as Tilghman's MMR vaccine, "if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury." 42 U.S.C. §§ 300aa–16(a)(2). Thus, absent any tolling, the limitations period for the

Brices' petition expired on May 9, 1995, over seven months before they filed their petition on December 19, 1995.[1]

Following his vaccination, Tilghman experienced delays in meeting his developmental milestones. On March 30, 1995, Dr. Eileen Vining, a neurologist, diagnosed Tilghman with a residual seizure disorder. Dr. Vining told Tilghman's mother that Tilghman had suffered an MMR reaction and suggested that the Brices file a claim under the Vaccine Program. At this point, the Brices had approximately five weeks left before the end of the limitations period. The Brices sought information on the Vaccine Program. They also began compiling Tilghman's medical records, which they say they believed were required to file their petition. However, Tilghman's mother did not send out requests for Tilghman's medical records until June 19, 1995. The Brices also unsuccessfully sought counsel to assist them in filing their petition, at least in some instances after the statutory deadline had passed. The Brices filed their Vaccine Act petition pro se *on December 19, 1995.*

On March 27, 1996, a special master dismissed the Brices' petition for lack of jurisdiction due to its untimely filing. The special master did not address the possibility of equitable tolling. The Brices petitioned for review, and on September 6, 1996, the Court of Federal Claims held that equitable tolling applies to post-Act cases and remanded to the special master to determine whether equitable tolling was appropriate under the circumstances. *See Brice v. Sec. Dep't of Health and Human Servs.*, 36 Fed. Cl. 474, 481–82 (1996). On November 1, 1996, the special master held

---

1. The Brices initially argued before the special master that Tilghman suffered a significant aggravation of his condition in September 1994, when the Brices discovered that Tilghman's condition was worse than it initially seemed. The Court of Federal Claims held that "where, as here, a petitioner alleges that a vaccine caused an injury and that later there was a significant aggravation of that same injury, the petitioner must file a petition

within 36 months of the first symptom or manifestation of the onset of the injury." *Brice v. Sec. Dep't of Health and Human Servs.*, 36 Fed. Cl. 474, 476 (1996). The Brices now apparently agree that the statute of limitations began to run on May 9, 1992, and in any case we agree with the analysis of the Court of Federal Claims, i.e., that the statute began to run with the manifestation of Tilghman's first symptoms on May 9, 1992.

an evidentiary hearing on the circumstances of Tilghman's vaccination, seizure, and the actions of the Brices in the years following the seizure. On November 26, 1996, the special master concluded that the Brices had "failed to exercise reasonable diligence in discovering essential information bearing on their son's claim" and therefore that equitable tolling was not appropriate. On February 13, 1998, the Court of Federal Claims again remanded to the special master, this time to make findings regarding whether the Brices exercised due diligence after they learned on March 30, 1995 that Tilghman suffered from residual seizure disorder. On remand, the special master concluded that between March 1995 and December 19, 1995, the Brices exercised "no diligence in this case, much less due diligence." On August 11, 1999, the Court of Federal Claims affirmed the special master's decision, holding that the special master's determination that the Brices had not acted with due diligence was not arbitrary or capricious. *See Brice v. Sec. Dep't of Health and Human Servs.*, 44 Fed. Cl. 673, 678 (1999). The Brices then appealed to this court.

### III

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3). Whether equitable tolling is permitted under the Vaccine Act is a question of law which we review de novo. *See Weddel,* 100 F.3d at 931. We note that a "statute of limitations is a condition on the waiver of sovereign immunity by the United States," and courts should be "careful not to interpret [a waiver] in a manner that would extend the waiver beyond that which Congress intended." *Stone Container Corp. v. United States,* 229 F.3d 1345, 1352 (Fed. Cir.2000) (quoting *Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (internal quotation omitted)).

As we have recently noted, the Supreme Court's decisions do not speak with perfect clarity on the subject of equitable tolling against the government. *See Stone Container Corp.,* 229 F.3d at 1352. In *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), which involved an equitable tolling claim against the government under Title VII, the Supreme Court adopted "a more general rule to govern the applicability of equitable tolling in suits against the Government." *Irwin,* 498 U.S. at 95, 111 S.Ct. 453. The Court held that once Congress had enacted a waiver of sovereign immunity, the "same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Id.* at 95–96, 111 S.Ct. 453. The Court explained that this new rule was "a realistic assessment of legislative intent as well as a practically useful principle of interpretation." *Id.* at 95, 111 S.Ct. 453.

The Supreme Court's subsequent decision in *United States v. Brockamp,* 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997), demonstrates that it is possible for the government to rebut *Irwin* 's presumption of equitable tolling and also creates uncertainty exactly as to when equitable tolling is permissible. In *Brockamp,* taxpayers asserted that the two-year limitations period of § 6511 of the Internal Revenue Code was subject to equitable tolling. The Court's opinion raised the possibility that equitable tolling might not apply to claims against the government unless those claims were similar to claims against private parties. Nevertheless, the Court was "willing to assume, favorably to the taxpayers but only for argument's sake, that a tax refund suit and a private party suit for restitution are sufficiently similar to warrant asking *Irwin* 's negatively phrased question: Is there good reason to believe that Congress did not want the equitable tolling doctrine to apply?" *Brockamp,* 519 U.S. at 350, 117 S.Ct. 849.

The Court in *Brockamp* then rejected equitable tolling under § 6511 based on the Court's determination that the relevant

limitations statute manifested congressional intent to preclude tolling. Several factors influenced its analysis. First, rather than using the simple language of ordinary limitations periods, the tax statute set forth its limitations in "a highly detailed technical manner, that, linguistically speaking, cannot easily be read as containing implicit exceptions." *Id.* Second, the statute also restated its limitations period "several times in several different ways." *Id.* at 351, 117 S.Ct. 849. Third, the statute set forth certain explicit exceptions to its time limits, and these exceptions did not include equitable tolling. *See id.* Fourth, the Court pointed to the underlying subject matter of tax collection as inconsistent with the case-specific exceptions of equitable tolling. It noted that the IRS processes over 200 million returns and issues 90 million refunds each year, and that equitable tolling could therefore create significant administrative difficulties. *See id.* at 352, 117 S.Ct. 849. *See also United States v. Beggerly,* 524 U.S. 38, 48–49, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998).

This court has been required to reconcile *Irwin* and *Brockamp* on at least two occasions. In *Bailey v. West,* 160 F.3d 1360, 1362–1368 (Fed.Cir.1998) (en banc), this court allowed equitable tolling of time limits for appealing Board of Veterans' Appeals decision to the Court of Veterans Appeals. That case represented a relatively easy analysis under *Irwin* and *Brockamp,* because none of the factors present in *Brockamp* was present in that case. *See Bailey,* 160 F.3d at 1365. In contrast, in *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461–63 (Fed.Cir. 1998), this court rejected equitable tolling in a tax refund case under the limitations period specified in 26 U.S.C. § 6532(a). However, the analysis of the limitations period in *RHI Holdings* was not particularly difficult either, as the statute of limitations in *RHI Holdings* was similar to that in *Brockamp.* The limitations period in *RHI Holdings* was set forth in a detailed, technical manner; the statute reiterated its limitations period three times;

the statute included a specific exception for extending the limitations period; and the underlying subject matter concerned tax collection. *See RHI Holdings,* 142 F.3d at 1462. Until now, this court has not been required to harmonize *Irwin* and *Brockamp* when some but not all of the factors identified in *Brockamp* were present.

## IV

Before turning to the analysis of equitable tolling in this case, we note that the equitable tolling issue for post-Act cases is not resolved by *Weddel v. Secretary of Health and Human Services,* 100 F.3d 929 (Fed.Cir.1996). In that case, this court held that equitable tolling of the limitations period was not available for claims in pre-Act cases. However, for such cases, the Act provided a statute of repose, and equitable tolling is not applicable to statutes of repose. *See, e.g., Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). As this court noted in *Weddel,* a "statute of repose cuts off a cause of action at a certain time irrespective of the time of accrual of the cause of action." *Weddel,* 100 F.3d at 931. In particular, for pre-Act cases, the Act provided that "no petition may be filed for compensation under the Program for such injury or death after the expiration of 24 months after the effective date of this title."National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, § 2116(a)(1), 100 Stat. 3755, 3769 (1986). The rule that equitable tolling is not available for statutes of repose is consistent with the principles of *Irwin* and *Brockamp:* by establishing an outer date for bringing an action, a statute of repose manifests a congressional intent not to allow tolling. *See Weddel,* 100 F.3d at 931.

## V

■ We now reach the question whether equitable tolling is available in post-Act

cases.[2] The Act states: "a vaccine set forth in the Vaccine Injury Table which is administered after the effective date of this subpart, if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury." 42 U.S.C. § 300aa–16(a)(2).

As an initial matter, the government asserts that under *Brockamp*, the rebuttable presumption of the availability of equitable tolling only applies if the federal cause of action is sufficiently similar to a private cause of action. The government argues that the Act creates a unique alternative to a traditional civil action and is thus unlike a private cause of action. It notes that the Act has a nonstandard evidentiary burden, that cases are tried through informal proceedings, that awards are limited with respect to pain and suffering and death benefits, that punitive damages are forbidden, and that judgments under the Act do not have the usual preclusive effects.

The reference in *Brockamp* to the suit against the government being "sufficiently similar" to a suit against a private party must be understood against the backdrop of *Irwin*, in which the Supreme Court presumed that the doctrine of equitable tolling "applicable to private suits," that is, suits against private parties, applied to suits "against the Government." *Irwin*, 498 U.S. at 95–96, 111 S.Ct. 453. If the suit against the government bears no similarity to a private suit, there is no basis for the presumption that Congress intended private equitable tolling rules to apply. Thus, for example, there is no reason to assume that a federal deadline for filing suit to challenge a generally applicable

government regulatory requirement should be governed by equitable tolling principles developed in private litigation. But the rule of "similarity" generally should not apply in the context of monetary claims against the government to bar equitable tolling. The distinctions set forth by the government between a Vaccine Act claim and a traditional tort action are not sufficient, in the words of *Brockamp*, to avoid "asking *Irwin*'s negatively phrased question: Is there good reason to believe that Congress did not want the equitable tolling doctrine to apply?" *Brockamp*, 519 U.S. at 350, 117 S.Ct. 849. In substance, a claim under the Vaccine Act is similar to a traditional tort claim in the sense that it seeks monetary recovery from an injury that traditionally was redressed by tort law. The Vaccine Program's procedural and remedial distinctions from the traditional tort system do not change this fundamental fact.

■ However, there is good reason to find that Congress did not want the equitable tolling doctrine to apply in post-Act cases. In *Brockamp*, the Supreme Court relied upon five criteria in determining that the Congress did not want to apply equitable tolling to a provision of the Internal Revenue Code: the statute's detail, its technical language, its multiple iterations of the limitations period in procedural and substantive form, its explicit inclusion of exceptions, and its underlying subject matter. *See Brockamp*, 519 U.S. at 350–52, 117 S.Ct. 849. It is true, as the Brices argue and the government concedes, that three of these factors are not present here: the Act is not particularly technical, it does not include multiple iterations of the limitations period, and the administrative complexity of the Vaccine Program does not compare to that of the

---

**2.** We reject the Brices' argument that because the government did not file a cross-appeal, this court cannot address whether equitable tolling is available in post-Act cases. We of course may affirm a trial court's order on any ground showing that the trial court's judgment was correct. *See Brown v. Allen*, 344 U.S. 443, 459, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

income tax. Nevertheless, we think that the remaining two factors are decisive.

First, the Act includes a specific exception from the limitations period for a petition improperly filed in state or federal court. Such a petition must be dismissed from the state or federal court, but "the date such dismissed action was filed shall, for purposes of the limitations of actions [i.e., the 36–month period] prescribed by [section 16 of the Act], be considered the date the petition was filed if the petition was filed within one year of the date of the dismissal of the civil action." 42 U.S.C. § 300aa–11(a)(2)(B). When an Act includes specific exceptions to a limitations period, we are not inclined to create other exceptions not specified by Congress.

Second, the limitations period is part of a detailed statutory scheme which includes other strict deadlines. Special masters are required to issue decisions within 240 days of the filing of a petition. *See* 42 U.S.C. § 300aa–12(d)(3)(A)(ii). Special masters may suspend proceedings for no more than a total of 150 days. *See* 42 U.S.C. § 300aa–12(d)(3)(C). In this connection, we note that the legislative history of the Act emphasizes the importance of quick resolution of claims. For example, Congress noted that "much of the equity in limiting compensation and limiting other remedies arises from the speed and reliability with which the petitioner can expect judgment." H.R.Rep. No. 99–908, at 17, *reprinted in* 1986 U.S.C.C.A.N. at 6358. To allow equitable tolling would conflict with these principles. While the doctrine of equitable tolling is designed to prevent harsh and unjust results, the difficulty with the doctrine is that it invites prolonged and wasteful collateral litigation concerning the running of the statute of limitations. This case is a quintessential example. After its initial dismissal by the special master, it was appealed to the Court of Federal Claims, was remanded to the special master, was appealed again to the Court of Federal Claims, was remanded again to the special master, was af-

firmed by the Court of Federal Claims, and was finally appealed here. It has now been over five years since the Brices' untimely filing of their petition. The government has informed us that other petitioners have sought to rely on equitable tolling in over thirty separate cases before the Court of Federal Claims. Lengthy collateral litigation is directly inconsistent with Congress's objective in the Vaccine Act to settle claims quickly and easily.

In addition, we note that the statute of limitations here begins to run upon the first symptom or manifestation of the onset of injury, even if the petitioner reasonably would not have known at that time that the vaccine had caused an injury. It would be quite odd for Congress to allow a limitations period to run in cases in which a petitioner has no reason to know that a vaccine recipient has suffered an injury, but to provide for equitable tolling when a petitioner is aware that a vaccine has caused an injury but has delayed in filing suit.

In support of their argument for equitable tolling, the Brices emphasize that Congress intended for claims under the Act to be settled "quickly, easily, and with certainty and *generosity*." H.R.Rep. No. 99–908, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6344 (emphasis added). They also note that in allowing equitable tolling under the Veterans' Benefit Act, this court relied upon that act's "uniquely benevolent statutory framework," *Bailey v. West,* 160 F.3d 1360, 1369 (Fed.Cir.1998), and they argue that the Vaccine Act also has a benevolent framework. This court, however, has already rejected the notion that the Act's purposes mandate the allowance of equitable tolling. In *Weddel,* we held that enforcement of a statutory cut-off date "provides claimants with certainty and in no way reduces the generosity of the program or speed with which the claims are adjudicated." *Weddel,* 100 F.3d at 932. Indeed, as we have noted above, allowing equitable

tolling may actually interfere with quick resolution of Vaccine Act claims.[3]

We are told by parties that Congress may be asked to consider an extension of the statute of limitations for post-Act cases because parents of injured children are often not aware of the remedies available under the Act. It is not our role to opine on whether such legislation is desirable or undesirable. That is a proper decision for Congress to make. We determine only that equitable tolling in inconsistent with the existing statutory scheme.

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Federal Claims is affirmed.

## COSTS

No costs.

PAULINE NEWMAN, Circuit Judge, dissenting.

The panel majority today holds that the National Childhood Vaccine Injury Act never permits equitable tolling of the period for filing a claim, whether the claim arose before the statutory enactment or afterward, no matter how worthy the petitioner or how compelling the petition. That is neither a necessary interpretation of the Vaccine Act, nor a tolerable one.

Tolling of a period of limitations awards no undeserved benefit; it simply opens the door to a petitioner upon whom the door should not be shut. It is a rare event, for most petitions are timely and courts are not sympathetic to delay. But courts are not precluded from evaluating the reason for the delay or from providing equitable relief when justice demands. As the Court stated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 559, 94 S.Ct.

756, 38 L.Ed.2d 713 (1974), "the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose." Why then would this court bar itself from the power and authority to do so?

The judicial prerogative, indeed our obligation, is to provide access to equitable tolling when the circumstances warrant. From my colleagues' ruling that this choice is not available in Vaccine Act cases, I must, respectfully, dissent.

## I

The panel majority, barring equitable tolling on any and all grounds, states that Congress intended to foreclose equitable tolling in Vaccine Act cases. However, the statute does not so provide, and the legislative record reflects no such intent. The Vaccine Act contains no basis for the majority's hypothesis that Congress imposed an absolute and irremediable bar to any petition filed beyond the three-year statutory limitations period. Indeed, the Vaccine Act itself extends the period of limitations for cases erroneously filed in the district court instead of under the Vaccine Act; this congressional action to relieve a specific foreseeable problem does not establish congressional intent to prohibit relief for every other tardy filing. The absence from the Vaccine Act of explicit authorization for equitable tolling is not unusual, and does not defeat the courts' equitable power. *See American Pipe*, 414 U.S. at 558, 94 S.Ct. 756 (recognizing judicial power to toll periods of limitation).

---

**3.** We note that of the cases relied upon by the dissent, only *Iavorski v. Immigration and Naturalization Service*, 232 F.3d 124 (2nd Cir. 2000), was issued after *Brockamp*. Moreover, the deportation statute and regulatory framework at issue in *Iavorski* had none of the criteria identified by the Supreme Court in

*Brockamp* as manifesting congressional intent to disallow equitable tolling. The *Iavorski* court found no indication in the "text, structure, legislative history, and purpose" of the statute at issue that Congress intended to restrict equitable tolling. *Iavorski*, 232 F.3d at 130.

In justifying its decision to bar the possibility of equitable tolling, the panel majority complains that the Supreme Court has "creat[ed] uncertainty exactly as to when equitable tolling is permissible," citing *United States v. Brockamp*, 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997), as conflicting with *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). In *Irwin* the Court confirmed that equitable tolling is as available in suits against the government as it is between private parties, observing that a rebuttable presumption of the availability of equitable tolling exists in suits against the government when Congress has not otherwise provided. 498 U.S. at 95, 111 S.Ct. 453. *Brockamp*, in turn, was a tax case wherein the Court carefully explained the specificity of its ruling that tax refund applications must meet the statutory filing deadline or be forfeited. These rulings illustrate the judicial obligation, as the Court explained in *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), to examine "whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." *Id.* at 427, 85 S.Ct. 1050.

As elaborated in *Irwin*, the time limit in an ordinary statute of limitations is generally assumed to be subject to equitable tolling. 498 U.S. at 95–96, 111 S.Ct. 453. In *Brockamp* the Court took pains to explain why that tax refund provision was an exception to the general rule, the Court citing the "unusually emphatic form" of the statutory period. The Court referred to the ninety million tax refunds a year and the explicit detail and interaction of "limitations in both procedural and substantive forms," 519 U.S. at 350, 117 S.Ct. 849, as showing congressional intent to impose a strict filing deadline in tax refund cases. The Court observed that "[t]ax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities." 519 U.S. at 352, 117 S.Ct. 849.

In contrast, in *Burnett* the Court was concerned with a "humane and remedial Act," the Federal Employers Liability Act, wherein the Court concluded that equitable tolling is available to a worker injured in the course of his employment. 380 U.S. at 427, 85 S.Ct. 1050. Similarly, the Vaccine Act is a case-specific system of individualized equities, meeting the criteria discussed in *Brockamp* as subject to equitable tolling. At oral argument the government agreed that the *Brockamp* factors differ from those of the Vaccine Act: unlike *Brockamp* the Act is not particularly emphatic about limitations; unlike *Brockamp* the Act does not state the filing deadline in a highly detailed technical manner; unlike *Brockamp* the Act does not reiterate the limitations period several times; and unlike *Brockamp* there would not be serious administrative problems in dealing with requests for tolling. Instead the government argued simply that since the Vaccine Act requires filing a claim with HHS as a prerequisite to civil litigation, there is a statutory emphasis on speed and diligence. The panel majority's reliance on *Brockamp* as totally barring equitable tolling is unsupported, is contrary to *Irwin*, and is contrary to the Court's overall treatment of the issue of limitations. Indeed in another recent case on equitable tolling, *United States v. Beggerly*, 524 U.S. 38, 48–49, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998), the Court referred to the "generous" twelve-year period of limitations in the statute there at issue, including that it ran from when the complainant "knew or should have known" of the existence of the cause of action. In the Brices' case, it is undisputed that the infant was not diagnosed with vaccine injury until only a few months before the end of the statutory period.

Equitable tolling does not decide the substantive merits of the claim. Nor does the availability of tolling ensure that it will be granted in a particular case. When granted, it simply permits the claimant to present the claim. Statutes of limitations are designed to provide fairness to defen-

dants who might otherwise be presented with stale claims after evidence is lost and memories faded. *See Burnett*, 380 U.S. at 428, 85 S.Ct. 1050. The government has not alleged any such problem with permitting the Brices' claim to go forward. Indeed, the *Burnett* Court remarked that the interest of justice may outweigh the purpose of protecting defendants from tardy claims. *Id.*

Extensive precedent illustrates the application of these principles. *See, e.g., Iavorski v. Immigration & Naturalization Service*, 232 F.3d 124, 129 (2d Cir.2000) (nothing in the text, structure, legislative history, or purpose of the deportation statute leads to the conclusion that Congress intended to bar access to tolling); *Wolin v. Smith Barney, Inc.*, 83 F.3d 847, 852 (7th Cir.1996) (equitable tolling is appropriate when delay prohibits the plaintiff from obtaining information essential to bringing suit); *Equal Employment Opportunity Comm'n v. Kentucky State Police Dep't*, 80 F.3d 1086, 1095–96 (6th Cir.1996) (tolling available to petitioners who did not know of retirement rights); *Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1175 (9th Cir.1986) (purpose of the statute, notice to the defendant, and the plaintiff's diligence determine the availability of equitable tolling). With the Court's reaffirmation in *Irwin*, *Brockamp*, and *Beggerly* that equitable tolling remains available in claims against the government unless inconsistent with the purpose of the statute, there is no weight of support for the majority's ruling that equitable tolling is never available in Vaccine Act cases.

The majority offers the theory that a total bar to tolling in the Vaccine Act achieves the Act's purpose of quickly resolving claims and avoiding "prolonged and wasteful collateral litigation." To the contrary—a total bar defeats the Act's purpose to provide a non-adversarial and equitable governmental response to vaccine-related injury. Barring the possibility of tolling simply bars the possibility of relief to an injured infant, thus defeating the foundation of the Vaccine Act.

The ruling that equitable tolling can never be invoked in Vaccine Act cases is directly contrary to the holding in *Irwin* that equitable tolling is as available against the government as it would be in private litigation of the cause. The just solution to the rare situation[1] of delay beyond the statutory period of the Vaccine Act is not to deny all remedy in all situations; the solution is to view each such situation with the sympathy, wisdom, and rigor appropriate to the particular case. I therefore must dissent from the majority's complete bar to access to equitable tolling in Vaccine Act cases.

II

The Court of Federal Claims did not preclude tolling, as does the panel majority, but held that the Brices did not exercise adequate diligence to warrant tolling of the three-year limitations period. However, the Brices presented a far stronger case of diligence than is acknowledged in the majority opinion. The record includes the following:

On May 9, 1992, nine days after infant Tilghman received a mumps-measles-rubella (MMR) vaccination on April 30, 1992, Mrs. Brice took Tilghman to the hospital, where he was diagnosed as in epileptic seizure. Mrs. Brice told the doctors that she believed he was suffering from a reaction to the vaccine. She testified that she was told that "she was using poor medical judgment and that she was only making a wild guess as to the cause of the seizure."

1. The panel majority cites a total of thirty Vaccine Act cases discussing equitable tolling since the inception of the Vaccine Act in 1986. Government counsel said there were "a few" cases a year. The majority apparently views this as an unreasonable burden. It would appear, however, that thirty requests for tolling since 1986 places the burden of injustice not upon the administrator of the Act but on the injured infants who will now be barred from raising the equitable issue.

On dismissal from the hospital she was told that he appeared to be normal.

Tilghman continued to experience seizures, and the Brices noticed that he slept for long periods. Their pediatrician, Dr. Rawitt, told the Brices that it was "normal because Tilghman was growing." In October 1994 the Brices observed that Tilghman made "funny mouth movements" after which he would sleep or rest for prolonged periods of time. The condition remained undiagnosed and the Brices took him to a pediatric neurologist, Dr. Blum, whose diagnosis was pediatric migraines after an encephalopathy caused by the MMR vaccine. Dr. Blum referred the Brices to another specialist, Dr. Vining, a renowned pediatric neurologist at Johns Hopkins. On March 30, 1995 Dr. Vining diagnosed Tilghman as suffering from residual seizure disorder with brain damage, resulting from the MMR vaccine. This was three years minus five weeks after the first seizure was observed on May 9, 1992.

Dr. Vining told the Brices about the Vaccine Act program of the Department of Health and Human Services. The Brices promptly contacted HHS. The Brices state that they spoke with several staff people and left five different messages on the automated messaging system. They state that they received no response to their inquiries for five weeks, that HHS personnel had little or no knowledge of the vaccine program or how to file a claim, and that they were given confusing and sometimes contradictory information with respect to the requirements for filing. In mid-June 1995 the Brices received information including the HHS Guidelines for filing a petition for compensation. The Guidelines state that complete medical records must be provided with the filing:

> The petition *must* be accompanied by *all* medical related records potentially relevant to the issue of whether petitioner is entitled to an award. [Emphases in Guidelines.]

The Guidelines further stress the importance of providing complete medical documentation when the petition is filed:

> (4) Petitions not accompanied by all the documents required by statute and the Vaccine Rules, or an affidavit explaining why any missing required documents are unavailable, will not be filed by the clerk.

On June 19, 1995, promptly following receipt of the Guidelines from HHS, Mrs. Brice requested copies of Tilghman's medical records from all of his treating physicians. The Brices reported the length of time it took to obtain the records. They averred:

> We could not obtain the needed medical records any faster. One set of records had been taken off site, microfilmed, shipped to Texas and misfiled in a warehouse. The pediatrician that Tilghman saw subsequent to his May 9, 1992 hospitalization refused to give us our child's records. We tried to think of a way to circumvent the problem by having a friend, who is a physician, request Tilghman's records. This was the record submitted in the petition. It was not the treating doctor's records but a compilation of every other doctor's records who had treated our son. (Note, to date this record still has not been obtained even after being requested by Robert T. Murphy, U.S. Department of Justice). We truly anguished over the lack of this record.

The Brices also started immediately to comply with the Guidelines' suggestion that they needed an attorney. Indeed, the Guideline says that the petition must be signed by an attorney who is a member of the bar of the Court of Federal Claims. The Brices' search for counsel qualified to handle their case included contacting a family member who was an attorney and seeking assistance from the president of the Maryland State Bar Association and the past president of the Maryland Bar. One of the five attorneys with whom the Brices consulted informed the Brices that

the statute of limitations had run and that she could not "in good conscience" file a claim on their behalf. The four other lawyers recommended filing a civil suit, but would not or could not help with a Vaccine Act petition, some mentioning the limitations problem. While attempting to retain counsel, the Brices continued to compile Tilghman's medical records, encountering delays and non-cooperation as they reported. The Brices eventually filed a Vaccine Act claim, *pro se*, on December 19, 1995. This was almost nine months after Dr. Vining's confirmation of Dr. Blum's diagnosis and notification of the HHS program, and seven months after the limitations period had run.

The Special Master held that "there is no diligence in this case, much less due diligence." The Court of Federal Claims affirmed. Although my colleagues on this panel endorse this ruling, it can not be reconciled with the evidence and the principles of equity. The parents were resourceful and persistent, coping with an ill and retarded infant while finding their way through the arcana of a complex statute. They were unable to obtain legal help, and encountered non-cooperation or delay by some of the treating physicians and hospitals. The HHS instruction, that medical records *must* be complete or their absence supported by affidavit, was unequivocal. Although the panel majority rules that the Brices should have ignored these instructions and filed sooner with incomplete records, the question is whether the Brices acted with reasonable prudence and diligence in light of the circumstances.

The Vaccine Act measures the limitations period from "the date of the first symptom or manifestation of onset or of the significant aggravation of such [vaccine-related] injury." 42 U.S.C. § 300aa–16(a)(2). For the infant Tilghman his vaccine-related injury was not diagnosed or accepted by the physicians who initially treated him, although his mother offered them the theory that there was a vaccine relationship. Almost three years elapsed

before his injury was diagnosed and its cause established. Although it is conceded that the first seizure occurred a few days after administration of the MMR vaccine, thus starting the running of the period of limitations, late diagnosis of causation is relevant to equitable tolling. The misdiagnosis and absence of critical information that left the Brices uninformed until almost the end of the statutory period are factors to be considered. The record shows that the Brices acted reasonably when their son was eventually diagnosed and they were told of the Vaccine Act. When viewed objectively and with humanity, and taking note of the generosity of administration required in the Vaccine Act itself, equitable tolling is surely warranted in this case.